IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Phase Four Industries, Inc., | NO. C 04-04801 JW |
| Plaintiff, | **ORDER GRANTING MARATHON'S PARTIAL SUMMARY JUDGMENT DISMISSING AFFIRMATIVE DEFENSES** |
| v. | |
| Marathon Coach Inc., | |
| Defendant. | |

## I. INTRODUCTION

This case involves a dispute between two companies in the recreational vehicle business. Plaintiff Phase Four Industries, Inc. ("Phase Four") is a California corporation engaged in the business of developing and manufacturing components, specifically waste disposal systems for recreational vehicles ("RVs"). (Phase Four's Motion for Partial Summary Judgment, hereinafter "Phase Four's MSJ," Docket No. 32, at 2:6-10.) Defendant Marathon Coach, Inc. ("Marathon") is an Oregon corporation which manufactures custom, high-end RVs from the chassis up. Marathon's RVs incorporate components and systems manufactured by Marathon and by third party companies like Phase Four. (Marathon's Motion for Partial Summary Judgment, hereinafter "Marathon's MSJ," Docket No. 37, at 2:7-10.)

In June of 2001, Marathon's engineers, Robert A. Schoellhorn, Mark A. Bryan, Alan B. Christianson, and Gerald R. Lacey filed an application for a patent entitled "Sewage System for Vehicles." The application was for a system for disposing of liquid waste form, for example a RV using a sewage hose which is deployed and retracted using air pressure. As Marathon began to incorporate an embodiment of

1  the invention in its custom-built RVs, Douglas Swarts, the owner of Phase Four, eventually demanded that
2  Marathon list him as a co-inventor because he claimed that in 1998, he had disclosed the sewage hose
3  extension invention under a confidentiality agreement to Mark Bryan, one of the listed inventors.  Marathon
4  refused this demand.

5        Eventually, a patent on the sewage hose deployment system was issued and assigned to Marathon,
6  U.S. Patent No. 6,607,009 ('009).  Phase Four began to market a sewage hose deployment product
7  called "Waste Master."  In October of 2004, Marathon wrote a "cease and desist" letter to Monaco, Inc.,
8  one of Phase Four's major customers, claiming that the Phase Four's "Waste Master" infringed the '009
9  patent.  Anticipating that Marathon would sue it for patent infringement, Phase Four filed this preemptive
10 action against Marathon by seeking a declaratory judgment that it does not infringe the '009 patent.  Phase
11 Four also alleges that the '009 patent is invalid because it was derived from the 1998 disclosure to Bryan.
12 Phase Four essentially contends that it is the real inventor of claims in the '009 patent.

13       Pending before the Court are cross-motions for summary adjudication of the inventorship and
14 derivation issues.

## II. STATEMENT OF FACTS

16       Beginning in 1997, Phase Four was attempting to develop a product which it initially called "Auto
17 Docking."  (Phase Four's MSJ, Ex. 101.)  A drawing of the Auto Docking product shows a module
18 designed to fit on the side of the RV, into which the user could connect electrical cables, domestic water,
19 television and telephone and other connections to the internal systems of the RV.  Of significance to this
20 case, the 1997 drawing displays a 4.5 inch compartment labeled, "SEWAGE HOSE STORAGE
21 SYSTEM."  The sewage hose is shown in a compartment and connected to components labeled "AUTO
22 DRAINS" and "HOSE FLUSH."  The notes on the drawing contain the following: "6. SEWER HOSE IS
23 AIR PRESSURIZED FOR STIFFNESS.  COLLAPSES."  (Id.)

24       On April 3, 1997, Douglas Swarts ("Swarts") of Phase Four sent a letter to Toni Patti at a
25 company called, Wheel Masters, soliciting a purchase of another Phase Four's product called "Auto
26 Drain."  In his letter, Swarts described his Auto Docking product:

> I am the inventor of Auto Drain (brochure enclosed) and a full time RVer, for the past five years. As a result, I spend considerable time in RV parks, connecting and disconnecting from the park facilities. Most, if not all RVs, require the owner to make two connections of the three main utilities, Electric power, Water, and Sewer. This results in the user having to store the electric cable, water hose and sewer hose in various compartments. Auto Docking Module (drawing attached) eliminates the storage problems, as well as requires the user to make only one connection to each source, while organizing all components in one area. The RV manufacturer benefits by reconnecting the coach services in one module, speeding assembly times, reducing costs and adding an important selling feature.

(Phase Four's MSJ, Ex. 102.)

With respect to the state of development of the Auto Docking product, Swarts wrote:

> Most of the components for the Auto Docking Module exist, so much less engineering time is needed prior to introduction. **The air filled sewer hose is the biggest challenge from an engineering stand point**, however can become an independent product sold to the after market, in another product called Suit Case Sewer System.

(Id. (emphasis added.))

On May 2, 1997, Ray Hunt, President of Wheel Masters wrote to Swarts expressing interest in assisting Phase Four with the marketing of its products. Hunt advised Swarts on strategies for penetrating the OEM market, and suggested that they work with the engineers to develop specifications for the OEM companies. (Phase Four's MSJ, Ex. 103-1.)

On July 24, 1997, Swarts wrote another letter to Tony Patti of Wheel Masters. Apparently, Ray Hunt had passed away:

> Needless to say I was shocked to hear about Ray and I would like to extend my deepest sympathy to you and your family. I didn't get to know Ray very well but felt a real friendship would develop in time.
>
> Ray was in the process of looking into the market potential for the Auto Docking Module as a complete product as well as individual components. **The air filled sewer hose has a lot of potential but needs some engineering time as well as a prototype built to prove its validity**. We also discussed a sewer box that would mount under the RV and be connected permanently to the dump valves. **The consumer would simply pull the hose out of the box and stick it in the sewer hole**. This product would use the existing type hose and become more compact as the new hose proved itself.

(Phase Four's MSJ, Ex. 104-1 (emphasis added).)

A Phase Four product description sheet dated April 15, 1998, describes a product called "Auto Drain":

3

1   The new Auto Drain is an automatic electric gate valve used to empty the holding tanks on
2   a Recreation Vehicle, boat or specialty vehicle.

(Phase Four's MSJ, Ex. 105.)

A Phase Four layout drawing of "Dock Master" dated August 23, 1998, is similar to the 1997 drawing labeled "Auto Docking Module." (Phase Four's MSJ, Exs. 101, 106). In the 1998 drawing, however, the sewage hose is shown folded in a serpentine pattern inside a rectangular compartment.

Apparently, in continuing his effort to develop and market Phase Four's Auto Docking system, on October 1, 1998, Swarts contacted Mark Bryan ("Bryan"), Director of Research and Development at Marathon. Bryan signed a "Confidentiality Agreement." (Phase Four's MSJ, Ex. 107-1, 2.) The agreement itself does not contain any reference to what, if anything, was disclosed.

Swarts declares that he disclosed to Bryan the concept of a product called "Dock Master."[1] Phase Four submits as evidence, a written product description dated October 1, 1998, describing the Dock Master system. Though dated the same as the confidentiality agreement, Phase Four does not claim that the actual product description page was given to Bryan on that day. The page describes the Dock Master as:

> . . . a system utilizing a group of devices arranged together and installed in the RV, to make hooking up to ground utility connections easier. All services within the RV are permanently attached to their respective function. When connecting the RV to any campground service it is only necessary to connect one end, i.e., attaching the RV to electrical service, the cord is connected to the campground electrical service outlet. The coach services will be active as soon as the electrical plug is inserted in the campground electrical outlet. The same is true for water, sewer, cable TV and the telephone services.
>
> All components are arranged in a special enclosure on the driver's side of the RV so when connecting to shore services the RV owner need only plug in one end of the respective service to activate it.
>
> ***
>
> Dock Master can accommodate manual components to accomplish individual tasks such as a hand crank reel to return water hose to an electric reel to retrieve the water hose. Optional equipment can be added to the module, as customer demand requires additional features.

(Phase Four's MSJ, Ex. 108.)

---

[1] During oral argument, Phase Four informed the Court that it had gone through multiple renditions of naming the product from "Auto Docking System" to "Dock Master".

Bryan acknowledges that Swarts disclosed Swarts' idea for a "Dock Master" plumbing bay system. According to Bryan, the system would automatically perform a series of steps such as draining the black water, draining the gray water tank, and dispensing deodorizer into the black water tank, but the system did not include an automatic extendable for retractable hose. (Marathon's MSJ, Declaration of Mark Bryan, hereinafter "Bryan Decl." ¶ 18.)

Marathon contends that its interest in developing an extendable RV sewer hose was independent of Swarts' attempt to interest it in his Dock Master product, which did not include an extendable hose. Marathon contends that prior to 1999, Robert A. Schoelhorn, the owner of Marathon, had wanted to develop an automatic sewer hose system for inclusion with Marathon coaches. (Bryan Decl. ¶ 2.) Bryan declares that he began working on the project around August of 1999. (Id.) On December 6, 1999, Marathon became interested in a system which would specifically use air pressure to automatically extend and retract the RV sewage drain hose. (Bryan Decl. ¶ 4.) Pursuant to that effort, Bryan declares that one of Marathon's engineers went to Home Depot and purchased a Ridgid brand canister vacuum to use to test the concept. (Id.) Marathon's records document the purchase of the vacuum. (Bryan Decl. Ex. C.) Three days later, on December 9, 1999, after having confirmed that air pressure would work to extend and retract a sewage hose, Bryan declares that he asked Marathon's electrical engineering department to prepare an electrical drawing. An engineering drawing dated December 9, 1999, labeled "Electric Drain Switching" shows air solenoids and reversing valves for electrically controlling the use of air pressure to extend the sewer drain pipe. (Bryan Decl. Ex. D.)

Marathon engineering drawings dated January 19, 2000 labeled "Sewer Hose Air System," layout the components and mechanisms for using air pressure to deploy and retract the sewer hose. (Bryan Decl. Ex. E.) By August of 2000, Marathon had built and tested a prototype, evaluating longevity of the system, time to operate, and other factors. The notes specifically mentioned that an air amplifier was used. (Bryan Decl. Ex. I.)

Meanwhile, between April and November of 2000, Swarts at Phase Four continued his efforts to perfect Dock Master. Swarts declares that during this period of time, "[he] realized that with the handle

5

1  nozzle valve closed, if it were airtight and vacuum-tight, then [he] could use compressed air to extend the
2  hose and a vacuum to retract the hose." (Phase Four's MSJ, Declaration of Douglas Swarts hereinafter
3  "Swarts Decl." ¶ 20.) Swarts admits that getting the hose to retract into a serpentine pattern was very
4  difficult. (Id.) He declares that in November of 2000, he realized from testing "that the sewer hose under
5  pressure wanted to extend linearly and under a vacuum tended to retract linearly. *It was then that the*
6  *light bulb went off."* (Id. (emphasis added).) Phase Four contends that this was an epiphany for Swarts.
7  For the first time, he saw where "all things [came] together for the full system." (Phase Four's MSJ, at 4,
8  Ex. 99.) From November 23, 2000 to October of 2002, Phase Four worked to produce a final prototype
9  which included a mechanism for using air pressure to extend and retract a sewer hose. In fact, it was not
10 until the near end of October of 2002 that Phase Four produced an embodiment of the invention. (Phase
11 Four's MSJ at 4:5-7; Exs. 99-112.)

12     In June 2001, Marathon filed an application for a patent on its Sewage System for Vehicles. In
13 the Fall of 2002, Swarts came to the realization that Marathon was developing a sewage hose extension
14 and retraction system. Eventually he came to understand that it operated on the same principles as Phase
15 Four's product. He also learned that Marathon was filing a patent on the invention. (Phase Four's MSJ,
16 Ex. 99.) In a telephone conversation with Bryan on Friday, September 13, 2002, Swarts asked if
17 Marathon would agree to allow him to pay a royalty and allow him to make and sell the system. Bryan told
18 him that he would have to discuss it with his supervisors. (Bryan Decl. ¶ 21.) An hour later, Swarts called
19 back to inform Bryan that he had discovered the confidentiality agreement the two of them signed in 1998,
20 and thus, demanded to be included as a co-inventor on the '099 patent. (Bryan Decl. ¶ 22, Ex. O.) Bryan
21 immediately spoke to his supervisor about the conversation and his supervisors told him to cease all
22 communications with Swarts and to document the incident. (Id.)

23     On October 14, 2002, Swarts wrote to Charlie Myers of Marathon:

24     Our company [Phase Four] specializes in waste management for RVs and we are currently
        working on patenting a complete system, which extending and retracting the hose is a part.
25

(Phase Four's MSJ, Ex. 136-1.)
26
//
27

28                                             6

**United States District Court**
For the Northern District of California

1   In 2003, Marathon was granted U.S. Patent No. 6,607,009, entitled "Sewage Systems for
2   Vehicles." Afterward, Marathon came to learn that Phase Four was marketing an extendable sewer hose
3   product called "Waste Master." In October 29, 2004, Marathon wrote a "cease and desist" letter to
4   Phase Four Industries, Inc. and one of Phase Four's major customers, claiming that Phase Four's "Waste
5   Master" product infringed the '009 patent. Anticipating that Marathon would sue it for patent infringement,
6   Phase Four filed this preemptive action against Marathon seeking a declaratory judgment that it does not
7   infringe the '009 patent and that the '009 patent is invalid.

8   Two of the bases for claimed invalidity urged by Phase Four are priority of inventorship and
9   derivation. The parties have now filed cross-motions for summary judgment on those two affirmative
10  defenses.[2] A hearing was held on April 27, 2005 and the matter submitted for decision.

### III.  DISCUSSION

**A.     The Standards for Partial Summary Judgment.**

13  The cross-motions before the Court ask the Court to adjudicate two issues in the case: (1) invalidity
14  of the '009 patent based on priority of inventorship; and (2) invalidity of the '009 patent based on
15  derivation. Granting Phase Four's motion for summary judgment of invalidity of the '009 patent may
16  dispose the entire case. Although patent infringement and invalidity are separate and distinct issues, an
17  invalid patent cannot give rise to liability for infringement. Medtronic, Inc. V. Cardiac Pacemakers, Inc.,
18  721 F.2d 1563, 1583 (Fed. Cir. 1983).

19  On the other hand, granting Marathon's cross-motion for summary judgment dismissing Phase
20  Four's affirmative defense of invalidity based on priority or derivation would not dispose of an entire claim.
21  There would still remain for adjudication other alleged bases of invalidity and unenforceability, and issues of
22  infringement and damages. Since Marathon's motion does not dispose of an entire claim, the Court regards
23  it as a cross-motion for partial summary judgment. Although motions for partial summary judgment are
24  common, Rule 56 of the Federal Rules of Civil Procedure, which governs summary judgment, does not
25  contain an explicit procedure entitled "partial summary judgment." In Advanced Semiconductor Materials

---

[2] Although the parties have not characterized the two bases for claimed invalidity as affirmative defenses, the Court has construed that they are.

7

America, Inc. V. Applied Materials, Inc., WL 419747 (N.D. Cal 1995) , defendant Applied Materials objected to using a motion for partial summary judgment to determine the limited question of whether certain conduct of Applied infringed ASM's patent. Judge Whyte addressed the propriety of partial summary judgment from the prospective of two well-known procedure treatsies and under Ninth Circuit law:

> Rule 56(d) allows the court, if practicable, upon a failed motion for summary judgment under Rule 56, to "ascertain what material facts exist without substantial controversy and that material facts are actually and in good faith controverted." There is a similar split of authority as to whether a party can independently move under Rule 56(d) for partial summary judgment on parts of claims. [Citations]. Professors Wright, Miller & Cooper agree that Rule 56(d)'s procedure "is designed to be ancillary to a motion for summary judgment." [Citation]
>
> * * *
>
> Supporting ASM's position, Professor Moore states that it "is clear that Rule 56 authorizes a summary adjudication that will offer far short of a final adjudication, even of a single claim." [Citation]. However, Moore states that "while Rule 56 'contemplate a summary judgment for a part or all of the claims made in the prayer of the claimant,' it 'does not contemplate summary judgments on evidentiary matters en route to that goal.'"
>
> * * *

Judge Whyte concluded that Ninth Circuit law is similarly unclear. He cited Lies v. Farrell Lines, Inc. 641 F.2d 765 9th Cir. 1981), where the Ninth Circuit cites Professor Moore in apparent approval of the propriety of partial summary judgment. However, the Lies case was reversed on other grounds, leaving Judge Whyte to wonder if the Circuit's apparent approval of partial summary judgment was now dicta. Judge Whyte also noted decisions by other district courts of the Ninth Circuit giving conflicting interpretations of the authoritative value of the Lies decision. Ultimately, in the ASM case, Judge Whyte found ample authority allowing an independent motion for summary adjudication of the "ultimate issue of patent infringement."

This Court agrees with Judge Whyte's analysis and concludes that summary judgment may be sought independently on any essential element of a claim or affirmative defense, even if the summary judgment would leave other triable issues. The efficacy of this approach is particularly suitable to this case because the issue of priority of inventorship or derivation is potentially case dispositive.

Partial summary judgment on an affirmative defense is governed by the same standard which applies to summary judgment of the claim. An affirmative defense which must be proved to defeat a claim

8

1  shall be deemed established (or on cross-motion defeated) when there is no genuine dispute over the
2  material historical facts and under the governing law, the moving party is entitled to have the defense
3  determined in its favor as a matter of law.  Fed. R. Civ. P. 56(c)(d); Celotex v. Catrett, 477 U.S. 317,
4  323-24 (1986).

5        As with a motion under Rule 56(c), a party moving for partial summary judgment "bears the initial
6  responsibility of informing the district court of the basis for its motion, and identifying those portions of the
7  pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any,
8  which it believes demonstrates the absence of a genuine issue of material fact."  Id. at 323.  If the movant
9  does not satisfy this initial burden, the non-movant has no obligation to produce anything and summary
10 judgment must be denied.  If, however, the movant meets this initial burden, then the burden shifts to the
11 non-movant to "designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324.  In other
12 words, to preclude entry of summary judgment, the non-movant must bring forth genuine issues of material
13 fact.  An issue of fact is "genuine" if it can reasonably be resolved in favor of either party.  See Anderson v.
14 Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of fact is "material" if it "might affect the outcome
15 of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be
16 counted."  Id.  In short, the non-movant "must do more than simply show that there is some metaphysical
17 doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).

18       It is this Court's responsibility "to determine whether the 'specific facts' set forth by the non-movant,
19 coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might
20 return a verdict in its favor based on that evidence."  T.W. Elec. Service v. Pac. Elec. Contractors, 809
21 F.2d 626, 631 (9th Cir. 1997).  "Where the record taken as a whole could not lead a rational trier of fact
22 to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsusuhita, 475 U.S. at 587.  In
23 conducting its analysis, this Court must draw all reasonable inferences in favor of the non-movant.  Masson
24 v. New Yorker Magazine, Inc., 501 U.S. 496, 520  (1991) (citing Anderson, 477 U.S. at 255).

25       The filing of cross-motions does not necessarily mean that the material facts are, indeed,
26 undisputed.  The denial of one motion does not necessarily require the grant of another.  See Atlantic
27 Richfiled Co.  v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1147 (10th Cir. 2000).  The motions must
28

1 be evaluated in accordance with the claim or defense which is the subject of the motion and in accordance
2 with the burden of proof allocated to each party. The motions pending before the Court concern the
3 affirmative defense of priority of invention and derivation. Although both of these defenses focus on
4 inventorship, they are distinct concepts, with different elements. The Court will consider them separately.

**B.     The Patented Invention.**

The motions pending before the Court were made before the Court conducted claim construction proceedings. Ordinarily, a motion challenging the validity of a patent comes after the Court has construed the terms of the patent. Claim construction would define the invention, the validity of which is being challenged. Trovan, Ltd. v. Sokymat SA, 299 F.3d 1292, 1301 (Fed. Cir. 2002) (". . . an inventorship analysis, like an infringement or invalidity analysis, begins as a first step with a construction of each asserted claim to determine the subject matter encompassed thereby. [citations omitted.]") Even though not requested by the parties, for purposes of the motions, the Court give the following preliminary construction of the patent claims at issue in this case:

The '009 patent contains four independent claims and associated dependent claims. Each independent claim discloses a liquid water materials system for a vehicle comprising a storage container for liquid waste materials, and a tubular waste disposal hose which is moveable from a first position to a second position in response to air pressure. For purposes of these motions, the Court defines the patented invention as a "vehicle sewage hose deployment and retraction system using air pressure."

An embodiment of the invention is a mechanism for extending and retracting a pre-connected sewage hose from a housing attached to the RV. In the embodiment, a user presses a button which causes air pressure to be exerted on the hose. A trap door opens and the hose extends from the RV plumbing bay to the dump site. The user uncaps the hose and connects it to the dump. When the user is ready to move the RV, the user releases the hose from the dump, caps the hose, and presses another button which uses air pressure to retract the hose into its bay and closes the trap door behind it. The parties submit that this mechanism makes RV owners' experience of dumping waste from their vehicles more convenient and pleasant than the conventional way. (Marathon's MSJ at 3-4; Ex. B.)

//

**C.     Invalidity of a Patent Based on Priority of Inventorship.**

Phase Four moves for summary adjudication contending that, the undisputed historical material facts prove by clear and convincing evidence that the '009 patent is invalid because the patentee was not the first to invent the vehicle sewage hose deployment and retraction system using air pressure. Correspondingly, Marathon moves for summary adjudication of validity on the ground that based on the undisputed historical facts, Phase Four has no proof by clear and convincing evidence that Phase Four was the first to invent the subject matter of the '009 patent.  The law presumes that a patent is valid. 35 U.S.C. § 282 ("Each claim of a patent shall be presumed valid independent of the validity of other claims.")  This presumption of validity persists unless or until it has been overcome by convincing evidence of error.

Pursuant to 35 U.S.C § 102(g), an applicant is entitled to a patent unless, "before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it." 35 U.S.C. §102(g).  Section 102(g) operates to ensure that a patent is awarded only to the "first" inventor in law.  If a challenger proves that the patentee's invention had been made by a prior inventor, who did not abandon, suppress or conceal the invention, pursuant to §102(g), the Court is empowered to invalidate the patent.

While Marathon's patent was pending, but prior to it issuing, Phase Four filed a patent application that included the same invention.  Because of Phase Four's later filing date, it is the junior party. See Hahn v. Wong, 892 F.2d 1028, 1032 (Fed. Cir. 1989) (stating the party who files later is considered the junior party).  The Federal Circuit has held that the correct standard of proof for priority of invention is "clear and convincing evidence," the junior party bearing the burden of pleading and proving priority. Environ Prods., Inc. V. Furon Co., 215 F.3d 1261 (Fed. Cir. 2000); see also 37 C.F.R § 41.207(a)(2) (2004).

There are two alternative ways a challenger of a patent based on priority of inventorship can prove priority: (1) The challenger can prove that it was the first to reduce an invention to practice; or (2) The challenger can prove that it conceived of the invention before the patentee conceived of it and also prove that the challenger used reasonable diligence to reduce the invention to practice. Id.

//

The Court considers each of these alternative theories.

**1.      Proof of Priority of Invention by Proving First Reduction to Practice.**

The Federal Circuit has held that the person who first reduces an invention to practice is "prima facie the first and true inventor." Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1577 (Fed. Cir. 1996). The issue of "reduction to practice" is a question of law. Scott v. Finney, 34 F. 3d 1058 (Fed. Cir. 1994). To show actual reduction to practice, the junior party must demonstrate that the invention is "suitable for its intended purpose." Id.

The evidence establishes that Marathon reduced one embodiment of a vehicle sewage hose deployment and retraction system using air pressure in December of 1999. The burden falls to Phase Four to present evidence of a reduction to practice of a vehicle sewage hose deployment and retraction system using air pressure earlier than December of 1999.

The evidence is that Phase Four did not reduce vehicle sewage hose deployment and retraction system using air pressure to practice as part of its product until 2002. (Phase Four's MSJ at 4:5-7; Exs. 99-112.) Nowhere in any of the exhibits or declarations does Phase Four produce evidence of an actual embodiment of a vehicle sewage hose deployment and retraction system using air pressure before Phase Four filed a patent application in October of 2002.

Therefore, with respect to the first alternative way of proving priority of inventorship—first to reduce to practice—Phase Four has failed to present evidence, which if, believed by a trier of fact, could prove by clear and convincing evidence that it reduced the invention disclosed in the '009 patent to practice before Marathon.

**2.      Proof of Priority of Invention by Proving First To Conceive Followed
         by Diligent Reduction to Practice.**

To be entitled to summary judgment of invalidity based on priority of inventorship under the "first to conceive theory," Phase Four must present clear and convincing evidence of the following:

1. That Phase Four conceived of a vehicle sewage hose deployment and retraction system using air pressure, the date of that conception, and that the date of Phase Four's conception was before Marathon conceived of it;

2. That Phase Four reduced the vehicle sewage hose deployment and retraction system using air pressure to practice and the date of that reduction to practice; and

3. That the period of time between its conception of the vehicle sewage hose deployment and retraction system using air pressure and its reduction of the system to practice was reasonable.

### i.     Conception

Conception is the formation in the mind of an inventor of a definite and permanent idea of the complete and operative invention. Trovan, Ltd. v. Sokymat Sa, et al., 299 F.3d 1292 (Fed. Cir. 2002). Conception is complete only when the idea is so clearly defined in the inventor's mind that one of ordinary skill in the art can construct the apparatus without unduly extensive research or experimentation. Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1577 (Fed. Cir. 1996).

Phase Four contends that Swarts conceived of the invention disclosed in the '009 patent as early as 1997. (Phase Four's MSJ at 2:24.) Since conception requires a permanent idea of a complete and operative invention, to prove the date of conception, Phase Four must prove the date that Swarts knew how to build a vehicle sewage hose deployment and retraction system using air pressure.

Swarts declares that he had a full conception in mind in 1997. The Federal Circuit has held that where evidence of conception is based on the oral testimony of the inventor, such testimony must be corroborated. Mahurkar, 79 F.3d 1572, 1577 (Fed. Cir. 1996). Courts do not require corroboration when the parties employ physical exhibits to prove conception. Id.  In this case, Phase Four presents no evidence beyond that of the uncorroborated declaration of the alleged inventor. Swarts alleges that the Auto Docking Module he created in March of 1997 sufficiently proves that he conceived the vehicle sewage hose deployment and retraction system using air pressure because in one of the drawings, there is a notation "sewer hose is air pressurized for stiffness. Collapses." (Phase Four's MSJ, Ex. 101.) There is no information on what "stiffness" was intended to accomplish. It is significant that at this same time, Swarts described the product as one where the user would have to "pull" the sewer hose to the dump site. (Phase Four's MSJ, Ex. 104-1.) In his declaration, Swarts acknowledges that he did not know how to make the pneumatically extending hose work until November of 2000, when "[he] finally had an epiphany"; "it was then that the light bulb went off." (Phase Four's MSJ, Ex. 99, Swarts Decl. ¶ 20.) Thus, unless there is

13

1    contrary evidence, the Court will regard the declaration testimony as an admission that before November of
2    2000, Swarts and Phase Four did not have a permanent idea of the complete and operative invention.

3    The evidence shows that Marathon's completed conception of the pneumatic sewer hose in
4    December of 1999, which is prior to the November of 2000 date Swarts attested to in his declaration.
5    Marathon's conception date is supported by invoices for materials purchased from Home Depot, internal
6    reimbursement documents, and the cover of an owner's manual. In addition, Marathon corroborates its
7    date of conception by providing declarations from Carroll White ("White"), Executive Vive President of
8    operations at Marathon Coach. According to White, on one occasion in December of 1999, Marathon's
9    engineers, including Mark Bryan, called him into Bryan's office. They demonstrated for him a sewer hose
10   that extended and retracted. They showed him a Rigid brand canister vacuum that operated the sewer
11   hose. When they adjusted the canister vacuum such that it produced air pressure, the sewer hose
12   extended. When they readjusted the canister vacuum so that it functioned as a vacuum, the sewer hose
13   retracted. For White, the engineers clearly demonstrated that the sewer hose system functioned for its
14   intended purpose of pneumatically extending and retracting the hose. (Marathon's MSJ, Decl. Carroll
15   White ¶ 3.)

16   Moreover, the evidence offered by Phase Four to prove conception in 1997 shows only an
17   automatic system for emptying and flushing RV sewage. Phase Four has produced no corroborative
18   evidence that the flushing system had the hose extension and retraction feature which is the subject of the
19   '009 patent. The exhibits indicate that Swarts had started work on an automatic sewer flushing system as
20   early as 1997 and that he was in the process of constructing a prototype. (Swarts Decl. Exs. 143, 144,
21   148, 150.) However, there is no corroboration for complete conception of even the flushing system in
22   1997. Phase Four admits, twice, once in its moving papers and once in its opposition papers that it was not
23   until November of 2000 that it "had developed the idea sufficiently to proceed to the building of a
24   prototype." (Phase Four's MSJ at 4, Opp'n at 3.) Swarts did eventually produce a flushing system which
25   incorporated a pneumatically extending, pre-connected sewer hose but that was not until 2002. (Phase
26   Four's MSJ, Ex. 099.)
27   //
28

14

Therefore, as to the first element, Phase Four has failed the present evidence which if believed by a trier of fact could prove by clear and convincing evidence that it conceived of the automatic RV sewage hose extension and retraction system as disclosed in the '009 patent before Marathon conceived of it.

### ii. Reasonable Diligence in Reduction to Practice.

The next element necessary to prove priority based on first to conceive is diligent reduction to practice. Generally, a patent is awarded to the first party to reduce an invention to practice, unless the other party can show that it was the first to conceive an invention *and* that it exercised reasonable diligence in later reducing the invention to practice. Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1577 (Fed. Cir. 1996) *(emphasis added)*. Marathon reduced the invention to practice nearly three years before Phase Four. This earlier reduction to practice alone would not defeat Phase Four's affirmative defense if Phase Four had evidence which, if believed, would be clear and convincing evidence of earliest conception. Reduction to practice does not prove earlier conception than Marathon. The Court declines to address whether Phase Four's reduction to practice would have been reasonable diligence if it had proof of conception in 1997.

### D. Invalidity of a Patent Based on Derivation.

Phase Four claims that Marathon's '009 patent is invalid because it was derived by Marathon from Phase Four. Under 35 U.S.C. § 102(f), a person is not entitled to a patent if "he did not himself invent the subject matter sought to be patented." 35 U.S.C. § 102(f). A patent secured on the invention of another is invalid. Although derivation and priority of inventorship both focus on inventorship, a claim that a patentee derived an invention involves different elements from a priority attack. Invalidity based on derivation as an affirmative defense addresses originality. The issue is not who is the first or prior inventor, but who made the invention.

In order to prove invalidity based on derivation, Phase Four must prove the following by clear and convincing evidence:

1. That Phase Four conceived of the vehicle sewage hose deployment and retraction system using air pressure as disclosed in the '009 patent, the date of that conception, and that the date of Phase Four's conception was before Marathon's conception; and

15

2. That an enabling disclosure of Phase Four's conception was communicated to Marathon. Gambro Lundia AB v. Baxter Healthcare Corp., 110 F.3d 1573, 1576 (Fed. Cir. 1997).

### i. **Prior Conception.**

For purposes of proving derivation, "prior conception" has the same meaning as discussed above with respect to priority. Conception is the formation in the mind of an inventor of a definite and permanent idea of the complete and operative invention. As discussed above, Phase Four cannot prove conception prior to Marathon. Marathon conceived of the vehicle sewage hose deployment and retraction system using air pressure and reduced it to practice by December of 1999. In contrast, Phase Four's earliest conception date is November 2000, evident by Swarts' declaration of his "epiphany." Marathon's corroborated conception date is almost a year prior to Phase Four's.

### ii. **Enabling Disclosure.**

Derivation requires a fully enabling disclosure of the invention to the patentee at a time prior to the patentee's date of invention. Gambro Lundia AB, 110 F.3d 1578. The disclosure should be such that it enables one of ordinary skill in the art to make the patented invention. Id.

Phase Four offers no evidence of an enabling disclosure to Marathon. Since it has been established that Marathon reduced the invention to practice in December of 1999, and Phase Four did not completely conceive of the invention before November of 2000, Phase Four could not have made any enabling disclosure to Marathon prior to 1999. Phase Four contends that the confidentiality agreement, signed by Mark Bryan, serves as proof of enabling disclosure to Marathon. Although the confidentiality agreement bears Bryan's signature, it does not disclose or specify the information to be disclosed to Marathon. (Phase Four's MSJ, Ex. 107-1).

Bryan declares that at one point, Swarts told him about Swarts' idea for a "Dock Master" plumbing bay system. However, he declares that the system did not include an automatic extendable or retractable hose. Bryan declares that at no time did Swarts describe to him in any way any concept for automatically extending or retracting sewer hose. (Bryan Decl. ¶ 18.) Bryan's declaration is corroborated by Phase Four's own exhibits of the Dock Master system layout. With the exception of the "stiffness" reference, there is no evidence of conception of or disclosure of an air pressure deployment system. In the absence of any other specific information, Phase Four fail to present clear and convincing evidence of an enabling

disclosure of the invention claimed in the '009 patent.  Therefore, as a matter of law, Phase Four cannot maintain a derivation claim pursuant to 35 U.S.C. § 102(f).

As further evidence of Phase Four's inability to prove of an enabling disclosure to Marathon, in its motion for summary judgment, Phase Four proffered an affidavit signed by Swarts attesting that on January 12, 2001, he faxed a "true and correct copy" of a diagram of the hypothetical system to Mark Bryan.  The diagram in Phase Four's Exhibit 114 contains a handwritten reference "sewer hose extend retract" at the top, and "for Mark Bryan" at the bottom left corner.  However, the diagram proffered by Marathon in its opening submission does not include any reference whatsoever to any automatic hose function.  There is no other handwritten reference other than "for Mark Bryan" at the bottom left corner.  (Phase Four's Opp'n at 6, Ex. 114; Marathon's Reply at 5, MSJ, Ex. M, Bryan Decl. ¶ 18.)[3]  In its reply to Phase Four's motion, Marathon alerted the Court to the discrepancy.  (Marathon's Reply at 5.)  Phase Four filed its opposition one hour after Marathon.  In its opposition, Phase Four admits, with respect to the evidence it submitted for the purpose of corroborating Swarts' contention that he disclosed the invention claimed in the '099 patent, the following:

> The Court should note that it has come to Phase Four's attention that Phase Four's Exhibit 114, also submitted by Marathon as Exhibit "M", differs from Marathon's submission in that the penciled in box at the top of the system flow diagram indicating "sewer hose extend retract" is not present in the document faxed to Marathon. As indicated in the attached Affidavit from Doug Swarts, Phase Four was unsure whether Marathon received this version of the diagram nor is it clear as to when Doug Swarts added the edit. To avoid spoliation, Phase Four submitted the exhibit as is. Phase Four admits that this edit was added after faxing the diagram to Marathon; however is still unsure as to when the edit was added to the diagram. See Affidavit from Douglas Swarts at ¶¶ 5-8.

(Phase Four's Opp'n at 6; Affidavit from Douglas Swarts ¶¶ 5-8.)

Short of accusing Phase Four of trying to manufacture the required corroborating evidence, this would clearly be argued as manufactured evidence to the trier of fact.  The discrepancy speaks for itself.  More importantly, even if the authenticity of the document can be sorted out, the "sewer hose extend retract" is not an enabling disclosure of the subject matter of the '099 patent.  Also, the date on the diagram, January 12, 2001, supports Marathon's contention that it was the first to conceive of the invention since it produced an embodiment in December of 1999.

//

---

[3]The Court attaches the two exhibits for evaluation.

17

### **IV. CONCLUSION**

The Court GRANTS Marathon's Motion for Partial Summary Judgment as to the affirmative defenses of invalidity based on priority of inventorship and derivation and orders these affirmative defenses dismissed.

The parties shall appear at the scheduled case management conference on October 31, 2005. Pursuant to the Civil Local Rules of Court, the parties shall file a *joint* case management statement no later than ten days before the scheduled conference addressing further proceedings in the case.

Dated: October 20, 2005       /s/ James Ware
JAMES WARE
United States District Judge

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Alan Heimlich alanheimlich@heimlichlaw.com
Brenna Legaard brenna@chernofflaw.com
David Michael Zeff Zefflaw1@aol.com
William O. Geny bill@chernofflaw.com

**Dated: October 20, 2005**                    **Richard W. Wieking, Clerk**

**By:      /s/ JW Chambers**
            **Ronald L. Davis**
            **Courtroom Deputy**

**United States District Court**
For the Northern District of California